UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FILED
IN OPEN COURT
APR - 8 2016
CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 2:16cr47 |
| ) | |
| KENNETH JOHN DEINES, ) | |
| ) | |
| Defendant. ) | |

## STATEMENT OF FACTS

If this matter had gone to trial, the United States would have proven the charge contained in the criminal information beyond a reasonable doubt, by proof of the following facts, among others:

1. Sub-contracting Firm G (Firm G), a Missouri corporation located in Fayetteville, NC, provides professional technical support services under subcontract to numerous Department of Defense (DoD) entities.

2. PAM began employment at Firm G in 2002 became the president and CEO. He became the sole owner in 2007.

3. PAM is listed as the originating member and principal officer of a North Carolina Limited Liability Corporation (NCLLC) formed on August 15, 2005. In August 2005, NCLLC was established with the stated purpose to own and/or operate commercial and residential property rentals. NCLLC is an entity controlled by PAM and his wife.

4. In 2006, KENNETH JOHN DEINES became the Corporate Controller of Firm G.

5. KDB is an accountant and the owner of Company A and Company B. Company A was established as a consulting company which could provide professional support services to



the United States Government (USG) as a Service-Disabled Veteran-Owned Small Business (SDVOSB). Company B was established as a rental property management company. Companies A and B are located in Newport News, Virginia.

6. From 2004, and continuing until 2014, in the Eastern District of Virginia and elsewhere, defendant DEINES, PAM and KDB knowingly and willfully conspired and agreed together with each other to defraud the United States of and concerning its governmental functions and rights.

7. Neither Company A nor Company B employed any persons, neither business owned nor leased any real property, and neither business performed any work or services of any kind in regard to the Firm G invoices. The invoices were subsequently entered into the accounting records of Firm G so that they appeared as legitimate expenses of Firm G. The defendants allowed the amounts indicated on each of these false invoices to be recorded in the Firm G accounting system knowing that such invoices were, in fact false, and would eventually be billed or allocated to USG contracts either as direct or indirect costs.

8. A cost is identified as a direct cost when it relates to a specific contract, subcontract, or purchase order. For example, materials purchased to complete the requirements of a contract are considered direct materials to that contract. The cost would be allocated/charged to the accounting code set up specifically for that contract in Firm G's accounting system. Direct costs are typically billed to the U.S Government on cost-reimbursable and Time and Material (T&M) contracts using invoices submitted directly to the Government, or in the case of a subcontract, to the prime contractor holding the contract with the Government.

9. Indirect costs are cost that are not directly traceable to a contract, but benefit the operation of the company as a whole. Examples include company security, the human resources



department, and facility costs such as electricity and maintenance. Indirect costs are estimated at during the year and allocated to all contracts using various indirect rates such as Overhead, Labor Fringe, or General and Administrative (G&A) rates. These estimated, or provisional indirect rates are billed to the U.S Government on cost-reimbursable contracts using invoices submitted directly to the Government, or in the case of a subcontract, to the prime contractor holding the contract with the Government.

10. In order to establish the final year-end indirect rates to be applied to U.S. Government contracts, Firm G is required in accordance with the Federal Acquisition Regulations (FAR) clause 52.216-7 "Allowable Cost and Payment", to submit an Incurred Cost Submission (ICS) within six months after the end of the fiscal year. The ICS required Firm-G to identify all indirect costs incurred that they claim are allocable to US Government contracts. PAM and DEINES prepared and submitted Firm G's ICS to the Defense Contract Audit Agency (DCAA), an agency within the Department of Defense (DoD), certifying that the Firm G costs claimed in the ICS were allowable in accordance with the cost principles of the FAR, when in fact, PAM and DEINES knew the ICS contained Company A and Company B costs which were false and fictitious. PAM and DEINES knew that those false costs would be allocated to all contracts, including U.S. Government contracts.

11. The G&A rates are also used in developing proposed prices for new contracts, including Firm Fixed Price (FFP) contacts and in determining Time and Material (T&M) contract labor rates. PAM and DEINES knew by using the G&A rates that included Company A and Company B costs, which were false, the contracted price was false. PAM and DEINES knew Firm-G would ultimately bill the U.S. Government or a U.S. Government prime contractor for costs on those contracts.

3



12. All of Firm G's business was from the U.S. Government, and primarily from the Department of Defense. The fraudulent payments Firm G made to Company A and Company B were made from money Firm G received from the U.S. Government either directly as a U.S. Government contractor or via U. S. Government prime contractors as a U. S. Government subcontractor.

13. In 2004, DEINES, in his position as the Firm G controller, entered into an agreement with others, including PAM and KDB, whereby fraudulent payments were made by Firm G to Companies A and B for work and services on behalf of Firm G that were never performed by Companies A and B or NCLLC. Company A payments to Firm G began in 2004 and Company B payments began in 2006. The invoices associated with the fraudulent payments were next entered into the accounting records of Firm G so that they appeared as legitimate expenses of Firm G relating to USG contracts. The defendants allowed the amounts indicated on each of these false invoices to be recorded in the Firm G accounting system knowing that such invoices were in fact false, and would eventually be billed or allocated to USG contracts. All or essentially all of Firm G's business was from the U.S. Government, and primarily from the Department of Defense. The fraudulent payments Firm G made to Company A and Company B were made from money Firm G received from the U.S. Government either directly as a U.S. Government contractor or via U. S. Government prime contractors as a U. S. Government subcontractor.

14. These invoices were created by DEINES and emailed to KDB. In return for his role in this scheme, KDB retained 5% of the fraudulent payments made by Firm G to Companies A and B. Shortly thereafter, KDB transferred the remaining 95% of these fraudulent payments to NCLLC, an entity controlled by PAM and his wife, or to PAM and his wife personally.

4



15. From February 2010 until June 2013, on at least 37 occasions, KDB received fraudulent interstate wire-transfer payments from Firm G into the business banking accounts of Companies A and B, based upon amounts listed on the fictitious invoices. In total, during this time period, KDB received approximately $7,569,196 in fraudulent payments from Firm G, retained approximately $332,596 for his personal use, and subsequently issued checks totaling $7,236,600 to NCLLC or to PAM and his wife personally.

16. No work or services were actually performed by Company A and Company B. Neither of the two companies employed any persons, neither business owned nor leased and real property, and neither company performed any work or services of any kind in regard to the invoices addressed to Firm G.

17. From 2004, and continuing until 2014, DEINES knowingly and willfully conspired with KDB, the owner of Companies A and B, and PAM, the principal officer of NCLLC, to submit false claims to the USG via fictitious invoices which were later billed/allocated to DOD contracts in the names of Companies A and B. In total, during this time period, fraudulently-obtained payments issued by Firm G to Companies A and B totaled $7,569,196.00.

18. KENNETH JOHN DEINES, in his position as the Firm G controller, entered into an agreement with others, including PAM, whereby fraudulent payments were made by Firm G to NCLLC for work and services on behalf of Firm G that were never performed by NCLLC. In fact, NCLLC had no employees. The false invoices were next entered into the accounting records of Firm G so that they appeared as legitimate expenses of Firm G relating to USG contracts. The defendants allowed the amounts indicated on each of these false invoices to be recorded in the Firm G accounting system knowing that such invoices were, in fact false, and



would eventually be billed or allocated to USG contracts. In total, from May 2010 to December 2012, fraudulently-obtained payments issued by Firm G to NCLLC totaled at least $5,710,040.06.

Respectfully submitted,

Dana J. Boente
United States Attorney

By: _____
Stephen W. Haynie
Assistant United States Attorney

After consulting with my attorney, I hereby stipulate that the above statement of facts is true and accurate, and that had the matter gone to trial, the United States would have proved the same beyond a reasonable doubt.

_____
KENNETH J. DEINES
Defendant

I am KENNETH J. DEINES' attorney. I have carefully reviewed the above statement of facts with the defendant. To my knowledge, the defendant's decision to stipulate to these facts is an informed and voluntary one.

_____
Kearns Davis
Counsel for Defendant

_____
Wes John Camden
Counsel for Defendant

_____
William P.H. Cary
Counsel for Defendant

_____
Caitlin M. Poe
Counsel for Defendant

